## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SHERYL ELAINE ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-CV-468-TCK-JFJ |
| | ) | |
| AHS HILLCREST MEDICAL | ) | |
| CENTER, LLC, A Foreign Limited | ) | |
| Liability Company, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION AND ORDER

Before the Court is Defendant AHS Hillcrest Medical Center, LLC's ("Defendant") Motion for Summary filed pursuant to Fed.R.Civ.P. 56(a). (Doc. 32). The plaintiff, Sheryl Elaine Anderson ("Plaintiff") filed a Response in opposition (Doc. 39), and Defendant filed a Reply. (Doc. 47). For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

Plaintiff asserts claims against her former employer for violations of the Age Discrimination in Employment Act of 1967 as amended, 29 U.S.C. 621 et seq. ("ADEA"), and for retaliation. Defendant contends this Court should dismiss the age discrimination and retaliation claims based on Plaintiff's failure to properly and timely exhaust the administrative process, as well as on the merits of her claims.

### I.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Zamora v. Elite Logistics, Inc.,* 449 F.3d 1106, 1112 (10th Cir. 2006); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (citations omitted). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670 (citations omitted).

## II. INTRODUCTION

Plaintiff's claims cannot proceed because her EEOC Charge of Discrimination ("Charge") was untimely—500 days past the filing deadline. Plaintiff's argument that the EEOC inquiry she submitted through the EEOC Public Portal should be considered a Charge is at odds with the most recent case to decide the issue, the case of *Gulley v. District of Columbia*, 2020 WL 4001471, at *7 (D. D.C. July 15, 2020) which held that an inquiry is not a Charge. Moreover, the EEOC's website says in four different places that an EEOC inquiry is not a Charge and if an employee is nearing his/her filing deadline, the employee must take additional steps to file a Charge. To hold that an inquiry is a Charge nullifies the 300-day filing deadline as the employee could essentially submit an inquiry, do nothing for a year-and-a-half (even after the EEOC administratively closes the case due to inactivity) and then file a Charge—as Plaintiff did in this case.

Although the Court need not decide the merits in this case given that the Charge was untimely, Plaintiff's claims of age discrimination and retaliation also fail. Plaintiff admits that she has no direct evidence of discrimination and that no one at Hillcrest made any ageist remarks. Instead, she claims circumstantial evidence shows that her termination must have been based on her age.

The evidence shows Danny Hardman ("Hardman"), Chief Nursing Officer, made the termination decision after Plaintiff, a Rapid Response RN, that treated critical care patients, admitted to recreating physician orders when they could not be located during a survey. Hardman based his decision on the fact that, as a hospital that provides patient care, all employees must have the utmost integrity, and by recreating orders Plaintiff put the hospital's reputation at risk.

## III.   BACKGROUND

### A. <u>Age Discrimination and Retaliation Claims</u>

The uncontroverted record establishes the following:[1]

Plaintiff began her employment with Defendant in November 2006 as a Registered Nurse ("RN"). (Anderson Dep. at 242:5-11).  Defendant provides various types of healthcare services including, but not limited to, behavioral health, cancer care, emergency care, heart care, rehabilitation, robotic surgery, urology, palliative care, and women's health care. (Brannon Decl. at ¶2).

In June 2015, Plaintiff was promoted to Rapid Response RN. (Anderson Dep. at 49:13-15). As a Rapid Response RN, Plaintiff was part of a rapid response team, a team that is activated during critical care and emergency situations at the hospital including stroke patients, patients in the intensive care unit ("ICU"), and "code blue" patients. (Anderson Dep. at 43:18- 45:15; Hardman Dep. at Hardman Decl. at ¶3). "Code blue" is a term used to indicate a patient requiring resuscitation or in need of immediate medical attention. (Hardman Dep. at 79:24- 80:15, Ex. 2;

---

[1] Although Plaintiff provided a response to all sixty (60) of Defendant's Unidsputed Material Facts, many of those responses are contrary to the requirements of Fed.R.Civ.P. 56 and Local Rule 56.1(c). Specifically, Local Rule 56.1(c) provides that "[e]ach fact in dispute shall be numbered, shall refer particularly to those portions of the record upon which the opposing party relies . . . ". In the instant case, not only are there instances in which Plaintiff disputes facts in the record without any citation to the record, but Plaintiff also makes statements that are not supported by the record cited.

Hardman Decl. at ¶3). The Rapid Response RN position is in a higher pay-grade than a typical RN position and is considered a promotion as it requires critical care experience and the ability to work in a fast-paced environment. (Anderson Dep. at 45:16-20; Stelzer Dep. at 15:8-17:9; Hardman Decl. at ¶4).

When Plaintiff received her promotion to Rapid Response RN full-time, she officially began reporting to Charles Sanders ("Sanders"), Associate Chief Nursing Officer. (Anderson Dep. at 49:7-50:22). Plaintiff is currently 51 years old. (Anderson Dep. at 242:12-18). Sanders is one year older than Plaintiff. (Brannon Decl. at ¶5).

On January 29, 2016, Plaintiff wrote an email to Brian Connor ("Connor"), Chief Operating Officer, stating that she needed to "report workplace bullying" by her boss, Sanders. (Anderson Dep. at 70:6-71:16, Ex. 10). Plaintiff testified that she had a meeting with Connor during which she told him, among other things, that Sanders would discuss his personal life with her, asked her if he could be in her husband's band, and would call her to chat. (Anderson Dep. at 72:3-88:16). Plaintiff testified that she did not "reciprocate" on his contact attempts and he soon began treating her differently. (Anderson Dep. at 74:8-75:19). Plaintiff alleges that younger nurses who "reciprocated" on his friendship attempts were awarded certain bonuses that they did not deserve. (Anderson Dep. at 74:8-75:19).

On May 30, 2016, Hardman was hired as Chief Nursing Officer ("CNO") and Plaintiff began reporting to Hardman. (Anderson Dep. at 89:13-15, 90:12-91:1). Hardman is five years older than Plaintiff. (Hardman Decl. at ¶20). On or about July 1, 2016, Plaintiff received a performance review score of 292.75 out of 300 possible points and received the highest merit increase percentage. (Anderson Dep. at 42:5-43:6, Ex. 6G; Hardman Decl. at ¶5). Hardman relied on Sanders's input while preparing the performance review as he had only been employed by

Defendant for one month. (Anderson Dep. at 93:4-94:10; Hardman Decl. at ¶6). Plaintiff testified that this was a good review score and there was nothing discriminatory or retaliatory about this review. (Anderson Dep. at 42:5-43:17).

On or about October 2016, Hardman promoted Leslie Stelzer ("Stelzer") to Manager over the Rapid Response RNs and House Supervisors as he wanted to focus more on the strategic aspects of the CNO position. (Anderson Dep. at 97:17-98:9, Ex. 13; Hardman Decl. at ¶7). Plaintiff began reporting to Stelzer who in turn reported to Hardman. (Anderson Dep. at 101:18-21; Hardman Decl. at ¶8). In November 2016, Sanders resigned his employment. (Brannon Decl. at ¶6).

In early February 2017, Defendant was going through a DNV stroke certification survey and was attempting to achieve the highest level stroke certification—the comprehensive stroke center (CSC) certification. (Anderson Dep. at 171:17-173:5, Ex. 25; Hardman Decl. at ¶9; Hardman Dep. at 27:23-29:1; Cummins Decl. at ¶4). Given that the Rapid Response RNs are on the stroke team (they are one of the lead point persons on suspected stroke patients), they are involved in the stroke certification program and survey. (Anderson Dep. at 173:6-174:7). Part of the stroke certification process involves the surveyors picking charts at random in order to "grade" the accuracy and completeness of the patient's charts. (Anderson Dep. at 187:11-188:1, 200:21-202:13, 203:16-204:10, Hardman Dep. at 33:21-35:11).

On or about February 8, 2017, one of the days that the surveyors were at the hospital conducting their survey, the surveyors were looking through a patient's chart—one that they had pulled at random—and discovered that there was a missing order set in the chart. (Anderson Dep. at 176:10-177:7; Cummins Decl. at ¶6). The patient who was seen at the hospital on February 1, 2017, just a week prior, was suffering from a stroke and the doctor had ordered tPA (tissue

plasminogen activator). (Anderson Dep. at 177:3-178:5, 181:5-12, Ex. 27). tPA is the only FDA-approved treatment for ischemic strokes and works by dissolving the clot and improving blood flow. (Anderson Dep. at 45:2-13; Hardman Decl. at ¶12). If administered within a certain time period, tPA may improve the chances of recovering or surviving. (Anderson Dep. at 45:2-13, 173:6-25; Hardman Decl. at ¶12).

The tPA order set is a packet that must be filled out and requires a physician's signature ordering the tPA for the patient. (Anderson Dep. at 181:5-12, Ex. 27). When the tPA order set could not be located by the surveyors, Gina Cummins, Service Line Administrator, reached out to Plaintiff to see if she knew where the order set was since she was the Rapid Response RN that had seen the patient on February 1, 2017. (Anderson Dep. at 176:10-177:7; Cummins Decl. at ¶¶5-7, Ex. A; Brannon Dep. at 71:17-72:1). Cummins reported to Brannon that both Dr. Andre Fredieu, the Neurologist that had ordered the tPA for the patient, and Jennifer Stevens, Stroke Coordinator, last saw the order set in Plaintiff's possession on February 1, 2017. (Cummins Decl. at ¶5, Ex. A). Plaintiff was frantically looking for the order set but was unable to locate it, so she recreated the order set. (Anderson Dep. at 177:18-178:22,179:14-16, 181:5-12, Ex. 27; Cummins Decl. at ¶¶5, 10, Ex. A; Brannon Dep. at 65:7-17).

Plaintiff testified that she filled out most of the form and signed the bottom of the form with "TORB Dr. Fredieu/S Anderson RN" and dated the document "2-1-17", the date the original order set had been created. (Anderson Dep. at 181:5-184:9, 260:7-262:23, Ex. 27). "TORB" stands for telephone order read back. (Anderson Dep. at 260:14-15). Hillcrest's Telephone Orders and Verbal Orders policy provides a mechanism by which a licensed healthcare professional can verbally provide orders in situations where any delay in treatment could cause the patient harm. (Brannon Decl. at ¶16, Ex. D).  The policy provides a very strict procedure that must be followed,

including having the individual receiving the information read back the complete order to the licensed healthcare professional providing the order by writing RBVO, RBTO, TORB, or VORB in order to prevent medication errors. (Brannon Decl. at ¶16, Ex. D).

Plaintiff testified that—despite writing "TORB Dr. Fredieu/S Anderson RN" and dating the document "2-1-17"—she did not read back the order to Dr. Fredieu on February 8, 2017, the date she recreated the order set. (Anderson Dep. at 261:1-13) Plaintiff also testified that she is the one that delivered the recreated order set to Hardman and Cummins. (Anderson Dep. at 179:14-19). When Plaintiff handed Cummins the order set, Cummins and Hardman recall that Cummins asked Plaintiff if she had located the order set and Anderson responded that she had just filled out another one. (Anderson Dep. at 179:14-22; Hardman Decl. at ¶14; Cummin Decl. at ¶10; Hardman Dep. at 66:23-69:13, Ex. 1; 88:13-89:5).

After Hardman heard Plaintiff state that she recreated the order set, he requested that Carrie Brannon ("Brannon"), Director of Human Resources, further investigate the incident. (Hardman Decl. at ¶15; Hardman Dep. at 88:21-89:5). Brannon conducted an investigation during which she spoke to several individuals including Cummins, Deana Sousa, Clinical Lead, Plaintiff and Tonya Stach, then Manager of Medical Surgical/ICU. (Brannon Dep. at 70:1-11; Brannon Decl. at ¶¶9-15, Exs. B, C). Brannon's notes reflect that during her initial conversation with Plaintiff on February 10, 2017, she pointedly asked Plaintiff if anyone asked her to recreate the orders and her response was "no." (Brannon Decl. at ¶10, Ex. C; Brannon Dep. at 65:7-17). Brannon's notes further reflect that Plaintiff stated that she recreated the order set with Sousa and that the writing on the orders regarding the dosage calculation was not her handwriting, it was Sousa's handwriting. (Brannon Decl. at ¶¶10-11, Ex. C).

On February 13, 2017 Brannon interviewed Sousa. (Brannon Decl. at ¶¶10, 13, Ex. C). Sousa told Brannon that she did help Plaintiff with portions of the order set but that Plaintiff did not tell her that the missing order set was from the prior week. (Brannon Decl. at ¶¶10, 13, Ex. C; Brannon Dep. at 72:7-73:3). Sousa told Brannon that if she had known that Plaintiff was recreating an order set from a week ago, she would not have helped her fill it out. (Brannon Decl. at ¶¶10, 13, Ex. C).

On February 14, 2017, Brannon presented her investigation findings to Hardman. (Brannon Decl. at ¶17; Hardman Decl. at ¶16; Hardman Dep. at 99:22-100:5). Hardman independently reviewed the evidence presented. (Hardman Decl. at ¶17; Hardman Dep. at 99:25-100:5). The evidence presented, including Plaintiff's admission to Brannon that she had recreated the order set, coupled with what he had witnessed first-hand, i.e. Plaintiff deliver the recreated order set and tell Cummins that she had recreated it, confirmed his suspicions that Plaintiff had falsified the order set. (Hardman Decl. at ¶17; Hardman Dep. at 66:1-70:16, 88:13-89:5). Hardman made the decision to terminate Plaintiff and based it on the fact that he determined that she had falsified an order set with the intent to deliver it to the stroke survey team and in doing so, put Hillcrest's reputation at risk. (Brannon Decl. at ¶18; Hardman Decl. at ¶18; Brannon Dep. at 106:3-15; Hardman Dep. at 66:1-70:16, 79:24-80:15, 88:13-89:5, Ex. 2).

Hillcrest's Disciplinary Action policy lists several level two "more severe" violations that may result in immediate termination of employment with or without previous progressive discipline. (Brannon Decl. at ¶19, Ex. E). One of these violations is "[a]ny conduct that threatens the safety, reputation, respect or dignity of patients, visitors, employees, the HMC System or physical property thereof." (Brannon Decl. at ¶19, Ex. E).

On February 14, 2017, Brannon and Stelzer called Plaintiff and told her that her employment had been terminated. (Brannon Decl. at ¶20). Brannon's notes reflect that after telling Plaintiff that the decision had been made to end her employment with Defendant, Plaintiff changed her story from their initial conversation and said that she recreated the order set because she was told to do so. (Brannon Decl. at ¶¶10, 21, Ex. C). Brannon's notes reflect that she told Plaintiff that she had previously asked her if anyone asked her to recreate the order set and Plaintiff had said no. (Brannon Decl. at ¶¶10, 21, Ex. C; Brannon Dep. at 65:7-17). Plaintiff denied that Brannon ever asked her that question. (Brannon Decl. at ¶¶10, 21, Ex. C).

Plaintiff testified that she never raised any complaints of age discrimination to Hardman. (Anderson Dep. at 251:21-252:2). Hardman was not aware that Plaintiff had made any complaints of age discrimination during her employment at Hillcrest. (Hardman Dep. at 90:16-91:2; Hardman Decl. at ¶19). Plaintiff testified that no one at Hillcrest ever made any ageist remarks. (Anderson Dep. at 266:17-267:5).

### B. Plaintiff's EEOC Inquiry and Filing of Charge[2]

---

[2] This Court previously denied Defendant's Motion to Dismiss based on administrative exhaustion. (Doc. 13). Plaintiff claims that because the Court has already decided the matter of exhaustion, the law of the case doctrine bars reconsideration of the issue. However, the law of the case doctrine does not apply to interlocutory orders such as a denial of a motion to dismiss. *Rimbert v. Eli Lilly & Co.,* 647 F.3d 1247, 1251 (10th Cir. 2011)(The law of the case doctrine does not apply "to rulings revisited prior to entry of a final judgment.").

In this case, because the Court's denial of Defendant's Motion to Dismiss Plaintiff's ADEA claims was an interlocutory order, the Court may reconsider the issue of administrative exhaustion. In fact, there are significant differences between a Court's ruling on a Motion to Dismiss which must focus solely on the four-corners of the Complaint, and a summary judgment motion, which considers the evidence in the case. At the time the Court ruled on Defendant's Motion to Dismiss, the Court did not have the benefit of discovery, including the declaration of an EEOC Investigator and various screenshots of the EEOC's website, as well as new case law that has emerged since the filing of the Motion to Dismiss.

On December 7, 2017, Plaintiff submitted an inquiry with the EEOC through the Public Portal.[3] (Anderson Dep. at 219:19-222:12, 222:21-25, Exs. 32-33; Cole Decl. at 3). The "Inquiry Information" form listed Plaintiff's deadline for filing a Charge as December 11, 2017. (Anderson Dep. at 222:21-25, 229:7-15, Ex. 33; Cole Decl. at 4). The "Inquiry Information" form referred to Plaintiff as "Potential Charging Party" and also identified an "EEOC (Inquiry) Number." (Anderson Dep. at 222:21-25, Ex. 33).

The Public Portal—in four different places—warns the employee that filing an inquiry is not the same as filing a Charge and if the employee is nearing his or her deadline, then there are additional steps an employee should take if he/she wants to file a Charge including submitting a signed letter that includes specific information. (Reed Decl. at ¶¶4-7, Exs. A-D). Plaintiff did not take these additional steps. (Cole Decl. at ¶¶3-6, 8-9).

The Public Portal states, "During the intake interview, you and an EEOC staff member will confidentially discuss the information you have provided, as well as your rights and responsibilities under the laws we enforce, our investigative process, and what happens after you file a charge. The interview will provide you with sufficient information to determine whether to proceed with filing a charge of discrimination." (Reed Decl. at ¶7, Ex. D).

---

[3] The Court takes judicial notice of the EEOC's website. In the Tenth Circuit it is not uncommon for courts to take judicial notice of the content of a government agency's website. See *Management New Mexico ex rel. Richardson v. Bureau of Land*, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of information referenced on two federal agencies' websites); *Kokinda v. Peterson*, 2006 WL 3507074, at *4 (W.D. Okla. Dec. 5, 2006), aff'd, 245 Fed. Appx. 751 (10th Cir. 2007) (taking judicial notice of information on the Oklahoma Department of Corrections website); *McCubbin v. Weber Cty.*, 2019 WL 4736966, at *11 (D. Utah Sept. 27, 2019) (county government website). And, specifically, courts may take judicial notice of the website of the EEOC. See e.g., *Mason v. Montgomery Cty.*, 2016 WL 4437642, at *1 (D. Md. Aug. 23, 2016) (taking judicial notice of EEOC website in granting motion for summary judgment); *Prince v. Dep't of Corr.*, 2017 WL 10023750, at *1 (M.D. Fla. June 27, 2017) ("the Court takes judicial notice of the intake questionnaire on the EEOC website . . ."). *Marcoux,* 632 F.2d 848, 851 (10th Cir. 1980).

Plaintiff was assigned an interview date of January 18, 2018, over a month after her filing deadline, and participated in that interview. (Anderson Dep. at 219:19-220:6, 222:21- 25, Exs. 32-33; Cole Decl. at ¶¶4, 7).The EEOC's records reflect that her potential Charge was administratively closed in April 2018 due to inactivity. (Cole Decl. at ¶8).

The EEOC's records reflect that Plaintiff contacted the EEOC again on March 19, 2019, the investigator then sent a draft Form 5 Charge to Plaintiff, and Plaintiff then filed her Form 5 Charge on or about April 19, 2019, 500 days past her filing deadline. (Anderson Dep. at 219:19-220:6, Ex. 32, Cole Decl. at ¶9).

## IV. ANALYSIS

### A. <u>Administrative Exhaustion</u>

Initially, Defendant contends Plaintiff's Complaint should be dismissed due to her failure to timely exhaust the required administrative remedies with regard to her age discrimination and retaliation claims. "Plaintiff [seeks to] establish precedent that submitting an inquiry through the EEOC's Public Portal constitutes a Charge. Not only would this precedent be inconsistent with the current case law and the EEOC's position regarding inquiries, but it would also allow a potential charging party to simply submit an inquiry, ignore the EEOC website's multiple warnings that an inquiry is not a Charge and the additional steps that are necessary if you want to file a timely Charge, fail to take those steps, do nothing for a year-and-a-half, and then decide to pursue a claim, as Plaintiff did here." (Doc. 33, Defendant's Motion for Summary Judgment at 11).[4] This would

---

[4]  Specifically, Defendant notes "Plaintiff's self-serving affidavit stating that she contacted the EEOC following her interview is simply untrue." Id., (Doc. 9-2, ¶10-12). See *Ellis v. J.R.'s Country Stores, Inc.,* 779 F.3d 1184, 1201 (10th Cir. 2015) (holding that "[a]ffidavits must contain certain indicia of reliability" and that the Court does "not consider conclusory and self-serving affidavits") "First, it contradicts the EEOC's records. Second, the affidavit, which was submitted in response to Defendant's Motion to Dismiss, is filled with untruths. Although Plaintiff claims that she has an email demonstrating that she reached out to the EEOC headquarters in Washington

essentially nullify the very purpose of the 300-day deadline—the just and efficient resolution of claims—and would put an undue burden on employers forced to litigate claims that are several years old.

Given that the EEOC Public Portal was launched in November 2017, there is very little case law interpreting whether an inquiry should be considered a Charge for exhaustion purposes. The most recent case to address the issue is *Gulley v. District of Columbia*, 2020 WL 4001471, at *7 (D. D.C. July 15, 2020) which held that an inquiry is not a Charge:

[t]he EEOC's regulations and the inquiry itself are clear that they [inquiry and the charge] are not one in the same. For one thing, there is the regulation. Compare 29 C.F.R. § 1614.105 (Pre-complaint processing), with Id. § 1614.106 (Individual complaints). [FN 5]. Then there is the inquiry itself, which calls Gulley a "potential charging party." See February administrative 2020 Inquiry at 1. More, the inquiry states Gulley's deadline to file a charge after the inquiry. Id.

FN 5 of the *Gulley* case quotes the EEOC's website and states:

See also EEOC Public Portal FAQ, https://publicportal.eeoc.gov ("Q: If I submit an outline inquiry, does that mean I filed a charge of discrimination? A: No. An inquiry is typically your first contact with the EEOC regarding your concerns about potential employment discrimination, which is followed by an interview with EEOC staff. Submitting an inquiry is the first step to determine whether you want to proceed with filing a formal charge of discrimination. A charge of discrimination is a signed statement asserting that an organization engaged in employment discrimination. It requests the EEOC to take remedial action. The laws enforced by the EEOC, except for the Equal Pay Act, require you to file a charge before you can file a lawsuit for unlawful discrimination. There are strict time limits for filing a charge.").

---

to complain, and they apologized [Doc. 9-2, ¶11], Defendant has not received that email despite Defendant's First Request for Production of Document No. 15 which specifically asked Plaintiff for all communications, including e-mails with any federal, state, or local government agency, including the EEOC. Third, although Plaintiff claims she did not have the assistance of an attorney, on the day of her termination she told Brannon she was represented by David Warta at the Smolen law firm—the same law firm that represents her in this lawsuit. (Brannon Decl. at Ex. C). Lastly, although Plaintiff's affidavit states that she made several contact attempts to the EEOC, her deposition testimony painted a far different picture as she was vague and often stated that she could not remember any details of her alleged contact attempts. (Anderson Dep. at 219:19-233:3). For the foregoing reasons, this conclusory and self-serving affidavit does not pass muster." (Defendant's Motion for Summary Judgment at n. 4, at 11-12).

Here, as in the *Gulley* case, the inquiry form Plaintiff received after answering questions on the portal refers to Plaintiff as "potential charging party." (Anderson Dep. at 222:21-25, 229:19-22, Ex. 33). Moreover, the inquiry form gave Plaintiff a filing deadline of December 11, 2017, an indication the EEOC did not consider the inquiry a Charge. (Anderson Dep. at 222:21-25, 229:7-15, Ex. 33; Cole Decl. at ¶F4). Also, the inquiry form identifies an "EEOC (Inquiry) Number", not a Charge number. (Anderson Dep. at 222:21-25, Ex. 33). Lastly, and most importantly, the EEOC website warns in four different locations that an inquiry submitted through the EEOC Public Portal is not the same as filing a Charge and that there are additional steps required to timely file a Charge if the employee is nearing his or her deadline (not the submission of an inquiry). (Reed Decl. at ¶4-7, Exs. A-D).

Further, the Public Portal informs employees, "During the intake interview, you and an EEOC staff member will confidentially discuss the information you have provided, as well as your rights and responsibilities under the laws we enforce, our investigative process, and what happens after you file a charge. The interview will provide you with sufficient information to determine whether to proceed with filing a charge of discrimination." (Reed Decl. at ¶7, Ex. D). The purpose of the interview is for an employee to determine if he or she wants to file a Charge.

In this case, Plaintiff's interview did not occur until a month after her filing deadline. Therefore, as in *Gulley*, the Court finds Plaintiff's inquiry is not a Charge, and holding otherwise would conflict with the EEOC's position on this issue. See *Gulley*, 2020 WL 4001471, at *7.

The Tenth Circuit has not decided whether an inquiry is a charge. However, in *Martinez v. Prairie Fire Development Group*, LLC, 2019 WL 3412264 (D. Kan. July 29, 2019), a case decided before *Gulley*, the court also held a mere inquiry is not a Charge. Citing *Federal Express Corp. v. Holowecki*, 522 U.S. 389 (2008) and *Semsroth v. City of Wichita*, 304 Fed. Appx.707, 714 (10th

Cir. 2008), the *Martinez* court noted that subsequent affirmative actions, beyond merely filling out an intake questionnaire, are necessary to demonstrate an intent to file a Charge.

Here, Plaintiff's subsequent actions after filing her inquiry do not demonstrate that she desired to start the EEOC administrative process. First, as stated above, she ignored the numerous warnings that she needed to act quickly beyond just submitting an inquiry in order to file a Charge. Further, her first contact with the EEOC after submitting the inquiry was after her deadline for submitting a timely Charge. Additionally, there is no evidence that, during the interview, Plaintiff requested that a Charge be filed. Not only did Plaintiff not request that a Charge be filed during her interview, but more concerning, she did nothing for a year-and-a-half. Investigator Holly Cole's declaration states that Plaintiff's potential Charge was closed in April 2018 due to inactivity and that Plaintiff did not contact them again until March 2019—over a year after she had her interview. (Cole Decl. at 8-9).

Finally, "courts are not, and should not be, sympathetic to plaintiffs—even pro se plaintiffs— that wait until last minute to try and navigate the EEOC process. See *Castaldo v. Denver Public Schools*, 276 Fed. Appx. 839, 842 (10th Cir. 2008) (holding that Plaintiff's pro se status did not justify equitable tolling where he: (1) was capable of navigating the administrative process for filing an EEOC Charge but did so too late; and (2) had the ability to contact an attorney but did not do so until well after the expiration of the 300-day filing period for filing an EEOC Charge); *Shempert v. Harwick Chemical Corp.*, 151 F.3d 793, 798 (8th Cir. 1998) (holding that "the situation was never beyond [plaintiff's] control so as to justify tolling the filing deadline" where plaintiff had 180-days to file an EEOC Charge and waited until two weeks before the deadline to file an intake questionnaire); *Dyson v. District of Columbia*, 710 F.3d 415, 422 (D.C. Cir. 2013) (holding that plaintiff cannot argue that the deadline should be equitably tolled where

her own delay in filing intake questionnaire caused a substantial portion of overall delay). Accordingly, the Court finds Plaintiff's claim that her inquiry constituted a Charge, or that it should be equitably tolled, is inconsistent with *Holowecki* and the EEOC's own position, and is denied.

## B. Plaintiff's Termination

It is well established that an employee alleging age discrimination and retaliation must file a Charge within 300 days of the alleged unlawful act. 29 U.S.C. § 626; *Godwin v. Southwest Research Institute*, 237 Fed. Appx. 306, 307 (10th Cir. 2007). Therefore, although the Court need not analyze the substance of Plaintiff's claims as she did not file a timely Charge with the EEOC, the only timely allegations relate to her termination in February 2017.

In the instant case, there is no direct evidence of age discrimination. In order to avoid summary judgment Plaintiff must prove: (1) she belongs to a protected age group; (2) her job performance was satisfactory; (3) she suffered an adverse action; and (4) the employer treated younger employees more favorably. See *MacDonald v. Delta Air Lines, Inc*., 94 F.3d 1437, 1441 (10th Cir. 1996). If Plaintiff establishes her prima facie case of discrimination, the burden shifts to Defendant to articulate a legitimate non-discriminatory reason for its decisions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805-05 (1973). Once Defendant articulates its reasons, the burden shifts back to Plaintiff to demonstrate that Defendant's explanation is unworthy of credence and merely a pretext for discrimination. *Id*. Ultimately, Plaintiff must offer evidence showing that her age was the "but for" cause or determinative factor in Defendant's discharge decision. See *Jones v. Okla. City Pub. Schs*. 617 F.3d 1273, 1277 (10th Cir. 2010) (ADEA plaintiff must show that "age was the factor that made the difference.").

First, Plaintiff has not established that Defendant treated a younger employee more favorably. The only comparator Plaintiff raises with regard to her termination is Deana Sousa

("Sousa"), Clinical Lead. (Anderson Dep. at 191:19-25). Plaintiff claims that Sousa helped her to falsify the tPA order set but was not terminated. (Anderson Dep. at 191:19-25). Sousa cannot be considered a comparator under current Tenth Circuit law as her conduct differs significantly from Plaintiff's. Although it is disputed whether or not Sousa knew why she was assisting Plaintiff with the order set,[5] the dispute is immaterial as Plaintiff testified that Sousa's conduct differed from her conduct in two critical respects:

• Plaintiff testified that she is the one that signed the bottom with "TORB Dr. Fredieu/S Anderson RN" and dated the document "2-1-17", the date the original order set had been created. (Anderson Dep. at 181:5-184:9, 260:7-262:23, Ex. 27).

• Plaintiff testified that she is the one that delivered the recreated order set to Hardman and Cummins. (Anderson Dep. at 178:14-19).

Plaintiff's conduct in recreating an order set that is administered to stroke patients was unacceptable pursuant to Defendant's policy. According to the record, Plaintiff was a Rapid Response RN, the highest level nurse at the hospital. She was aware that physician orders are never to be recreated. By signing her name and Dr. Fredieu's name, back-dating the order, and then delivering the order set to Cummins, Plaintiff carried through with the falsification.[6] By contrast, even if it were true that Sousa knew she was recreating an order set, her conduct, in merely writing in some dosage information, did not rise to the same level as she was not authenticating the order set with her signature, and moreover, did not take affirmative steps to deliver that order set to the

---

[5] Plaintiff testified that Sousa was told by Tonya Stach, then Manager of Medical Surgical/ICU, to recreate the order set. (Anderson Dep. at 179:23-180:9). This is disputed as Sousa told Brannon that she was not aware that Plaintiff was recreating an order set from a prior week and if she had known that, she would not have assisted her. (Brannon Decl. at ¶¶10, 13, Ex. C; Brannon Dep. at 72:7-73:3).

[6] The order set that Plaintiff delivered to Cummins was not submitted to the stroke surveyors and was not used during the stroke survey. (Stach Decl. at ¶4; Cummins Decl. at ¶11).

surveyors. *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (employees must have been subject to discipline for "conduct of comparable seriousness in order for their disparate treatment to be relevant"); *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000) (granting summary judgment to the employer and holding that "[a] company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct. Our role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments.").

More importantly, even if Plaintiff's testimony is true that she told Brannon both she and Sousa were directed to recreate the order, there is no evidence in the record which demonstrates that Hardman knew Plaintiff made this claim, or that Sousa participated beyond the minimal involvement revealed by Brannon's investigation.[7] By contrast, Hardman heard Plaintiff tell Cummins that she recreated the order set. See *Kirkpatrick v. Pfizer, Inc.,* 391 Fed. Appx. 712, 721 (10th Cir. 2010) ("[i]n determining whether the proffered reason is for a decision which was false this court examine[s] the facts as they appear to the person making the decision"). Therefore, Plaintiff cannot establish that Defendant treated Plaintiff less favorably than Sousa.

Defendant also claims there was a legitimate non-discriminatory reason for terminating Plaintiff --- Plaintiff's falsification of a physician order set during a stroke survey put the hospital's reputation at risk. Although Plaintiff's version of events is inconsistent regarding whether or not she was directed to recreate the order set, she has consistently acknowledged (both during her

---

[7] After conducting her investigation and interviewing both Sousa and Plaintiff, Brannon believed that Sousa's participation was significantly different than that of Plaintiff as Sousa "was unaware of what was happening at the time." (Brannon Dep. at 72:7-73:3). See *Johnson v. Weld Cnty., Colo.,* 594 F.3d 1202, 1211 (10th Cir. 2010) (holding that the role of the Court "isn't to ask whether the employer's decision was wise, fair or correct, but whether it honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs").

employment and during her deposition)  that she recreated the order set. This act, which Hardman

determined constituted falsifying a physician order put the hospital's reputation at risk and could

not be tolerated. Accordingly, Hardman made the decision to terminate Plaintiff's employment.

*Wheat v. Chase Bank,* 2014 WL 457588, at *19 (S.D. Ohio Feb. 3, 2014) (holding that a

"company's concern about its reputation" is a legitimate nondiscriminatory reason for its actions);

*Ellis v. Bank of New York Mellon Corp.*, No. CV 18-1549, 2020 WL 2557902, at *12 (W.D. Pa.

May 20, 2020) (granting summary judgment to employer and holding that terminating plaintiff's

employment because her actions created a "reputational risk" was a legitimate non-discriminatory

reason for the termination.).

Once the defendant has articulated a legitimate, non-discriminatory reason for its decision

to terminate a plaintiff, the burden shifts to the plaintiff to show this reason is merely a pretext for

discrimination. A plaintiff can show that legitimate, nondiscriminatory reasons are pretextual by

pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons for its action that a reasonable factfinder could

rationally find them unworthy of credence . . . " *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323 (10th

Cir.1997) (quotes omitted). Plaintiff at all times bears the burden of proving that age was the "but

for" cause of the challenged action. See *Wilbanks v. Nordam Grp., Inc*., 2010 WL 4272581, at *11

(N.D. Okla. Oct. 25, 2010) (granting summary judgment in favor of defendant on plaintiff's ADEA

claim because, inter alia, plaintiff "ha[d] not made a showing that she would not have been

terminated but for her age.").

Plaintiff cannot show pretext. First, Hardman is in the same protected class as Plaintiff. In

fact, he is five years older than Plaintiff. (Hardman Decl. at ¶20; Anderson Dep. at 242:12- 18).

Therefore, it makes little sense he would discriminate against Plaintiff based on age, when she is

younger than him. It is well-established that "[a] plaintiff may have difficulty establishing discrimination where the alleged discriminatory decision-maker is in the same protected class . . ." *Kendrick v. Penske Transp. Servs., Inc*., 1999 WL 450886 (D.Kan. Apr.13, 1999), aff'd, 220 F.3d 1220 (10th Cir.2000).

Second, Plaintiff does not attribute any ageist comments to Hardman, Brannon, or anyone else at Hillcrest, further demonstrating there was no discriminatory intent. (Anderson Dep. at 266:17-267:5). Even in cases where there are a few stray ageist remarks—which is not the case here—the Tenth Circuit has held that is not enough to demonstrate pretext. See *Wagoner v. Pfizer, Inc*., 391 Fed. Appx. 701, 708 (10th Cir. 2010) (holding that supervisor's comment that he did not want older employees under his management and comment about employee retirement plans was insufficient to demonstrate that employer's proffered legitimate, non-discriminatory reasons for terminating her was pretext for discrimination.).

Finally, on Plaintiff's last performance review, seven months prior to her termination, Hardman gave  Plaintiff a good score, a score that gave her the highest merit increase. (Anderson Dep. at 42:5- 43:6, Ex. 6G). Plaintiff testified that there was nothing discriminatory or retaliatory about that review. (Anderson Dep. at 42:5-43:17).

Given these three facts—Hardman being older than Plaintiff, no ageist comments, and Hardman giving Plaintiff a good performance review score seven months before her termination—Plaintiff cannot show pretext. See *Young v. Dillon Cos.,* 468 F.3d 1243, 1250 (10th Cir. 2006) (holding that to show pretext for discrimination "this Court has held that the plaintiff must demonstrate that the defendant's proffered [age]-neutral reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief.").

C. **Retaliation**

The Court also finds Defendant is entitled to summary judgment on Plaintiff's retaliation claim. A plaintiff claiming unlawful retaliation under the ADEA bears the initial burden of establishing a prima facie case of discrimination. *Sanchez v. Denver Public Schools*, 164 F.3d 527, 533 (10th Cir. 1998). To do so she must show: 1) she was engaged in opposition to ADEA discrimination; 2) she was subjected to adverse employment action; and 3) a causal connection existed between the protected activity and the adverse employment action. Id. Here, Plaintiff alleges she was terminated both for complaining about pay issues during her employment and for raising concerns to Brian Connor, Chief Operating Officer, about Chuck Sanders, Associate Chief Nursing Officer. (Anderson Dep. at 192:14-194:19).

During Plaintiff's employment, she raised two discrete issues relating to her pay. Plaintiff's first complaint was that she was not compensated for working the weekend shift option, an arrangement between Hillcrest and the RN whereby the RN is compensated at a premium for working every weekend. (Anderson Dep. at 115:5-118:19). Plaintiff's second complaint was that Hillcrest could not pay her immediately (she was cashing out her PTO) when hackers had tied up her bank account. (Anderson Dep. at 104:18-109:9). Instead, Plaintiff was told that checks could only be cut on certain days that correlated with the payroll cycles. (Anderson Dep. at 104:18-109:9). Plaintiff disagreed that a check could not be cut immediately. (Anderson Dep. at 104:18-109:9).

Plaintiff cannot establish a prima facie case of retaliation[8] related to her pay concerns as she did not engage in protected activity under the ADEA. Specifically, raising concerns regarding

---

[8] Further, as discussed *supra*, even if Plaintiff could establish a prima facie case of retaliation, which she cannot, for the reasons described above, Defendant had a legitimate and non-

pay issues alone does not constitute protected activity under the ADEA. See *Stapp v. County Board of County Commissioners*, 672 Fed. Appx. 841, 851 n. 7 (10th Cir. 2016) ("To qualify as protected opposition the employee must convey to the employer his or her concern that the employee has engaged in a practice made unlawful by the ADEA. General complaints . . . will not suffice."); *Garcia-Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547, 560 (D. Kan. 1995) ("protected activity clearly does not include those situations where the opposition relates not to unlawful employment practices but to a personal grievance.").

Plaintiff also alleges she was retaliated against for raising concerns to Connor about Sanders. On January 29, 2016, Plaintiff wrote an email to Connor, Chief Operating Officer, stating that she needed to "report workplace bullying" by her boss, Sanders. (Anderson Dep. at 70:6-71:16, Ex. 10). Plaintiff testified that she had a meeting with Connor during which she told him, among other things, that Sanders would discuss his personal life with her, asked her if he could be in her husband's band, and would call her to chat. (Anderson Dep. at 72:3-88:16). Plaintiff testified that she did not "reciprocate" on his contact attempts and he soon began treating her differently. (Anderson Dep. at 74:8-75:19). Plaintiff alleges that younger nurses who "reciprocated" on his friendship attempts were awarded certain bonuses that they did not deserve. (Anderson Dep. at 74:8-75:19).

Plaintiff's retaliation claim based on this allegation is also without merit. First, the concerns she raised to Connor do not constitute protected activity, and second, even if it did, she cannot establish a causal connection between her raising the concerns and her termination as the undisputed record demonstrates that Hardman was not aware that she had raised concerns about

---

discriminatory or retaliatory business reason for terminating Plaintiff, namely, her recreation of an order set during a stroke survey, an act that jeopardized Hillcrest's reputation.

Sanders.[9] (Hardman Dep. at 90:16-91:2; Hardman Decl. at ¶19; Anderson Dep. at 251:21- 252:2).

It is well-established that a decision maker cannot retaliate against an employee "because" she engaged in protected activity where the decision maker was not aware the employee had engaged in protected opposition. See *McElroy v. American Family Ins.,* 630 Fed. Appx. 847, 851 (10th Cir. 2015) (citing 29 U.S.C. § 623(d) and stating that "an employer's actions against an employee cannot be because of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition); See *Webb v. Level 3 Communications, LLC*, 167 Fed. Appx. 725, 735 (10th Cir. 2006) (affirming summary judgment to employer where employee failed to prove that the decision maker knew of employee's protected activity); *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993) (holding that a plaintiff must show that the individual who took the adverse action against him or her knew of the employee's protected activity).[10]

Moreover, Plaintiff's concerns about Sanders that she raised to Connor, that he treated RNs that "reciprocated" on his friendship attempts more favorably, do not constitute protected activity. It is well-established that favoritism concerns that stem from something other than a protected category, are not protected. *Anderson v. Oklahoma State Univ. Bd. of Regents*, 342 F. App'x 365, 368 (10th Cir. 2009) (affirming summary judgment and holding that favoritism that is not based

---

[9] For the same reasons as Plaintiff's retaliation claim related to her pay, even if Plaintiff could establish a prima facie case, which she cannot, Defendant can state legitimate reasons for its actions and Plaintiff cannot demonstrate pretext.

[10] Moreover, Plaintiff cannot establish a causal connection based on temporal proximity where her complaint to Connor was in January 2016 and she was terminated over a year later in February 2017. See *Meiners v. Univ. of Kan*., 359 F.3d 1222, 1231 (10th Cir. 2004) (a minimum of two months and one week and a maximum of just under three months between the protected conduct and the adverse action is "probably too far apart . . . to establish causation by temporal proximity alone."). "As a practical matter, it makes little sense that Hardman would have any incentive to terminate Plaintiff based on her complaint about Sanders when Sanders was no longer employed by Hillcrest." (Brannon Decl. at ¶6).

on a protected category is not actionable); *Clark v. Cache Valley Elec. Co*, 573 Fed. Appx. 693, 697 (10th Cir. 2014).

## V. CONCLUSION

Accordingly, for the reasons set forth above, Defendant's Motion for Summary Judgment is granted.

**IT IS SO ORDERED this 10th day of August, 2021.**

TERENCE C. KERN
United States District Judge